## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

Patrick's Restaurant, LLC,

       File No. 18-cv-00764 (ECT/KMM)

      Plaintiff,

v.

      **OPINION AND ORDER**

Sujit Kumar Singh,

      Defendant.

---

Edward P. Sheu, Best & Flanagan LLP, Minneapolis, MN, for Plaintiff Patrick's Restaurant, LLC.

John A. Kvinge, Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, MN, for Defendant Sujit Kumar Singh.

---

This is a breach-of-contract case. Patrick's Restaurant, a Minnesota citizen, alleges that Sujit Kumar Singh, a citizen of India, agreed to invest $1.3 million in Patrick's in consideration for part ownership of the business but then paid nothing and walked away. Patrick's seeks recovery of an amount close to the $1.3 million it alleges Singh contracted to invest, plus consequential and incidental damages. Singh has moved under Federal Rule of Civil Procedure 12(b)(2) to dismiss the case for lack of personal jurisdiction. Alternatively, he has moved under Rule 12(b)(6) to dismiss Patrick's complaint for failing to state a claim upon which relief may be granted. Both motions will be denied. Patrick's has demonstrated that Singh's contract-related contacts with Minnesota coalesce to form a prima facie showing of personal jurisdiction, and Patrick's pleads a prima facie case on the merits.

I

The facts leading up to this litigation span approximately eight months and two continents, and they begin in August 2017.  That month, Singh, a citizen and resident of India, "approached" Patrick Bernet "for the exclusive opportunity to invest in Mr. Bernet's Patrick's Restaurant, Inc."  Am. Compl. ¶¶ 3, 7 [ECF No. 27].  Bernet operates several "Patrick's Group" restaurants in Minnesota, and today he is the sole member and owner of Patrick's Restaurant, LLC.  *Id.* ¶ 2; *id.* Ex. 1 [ECF No. 27-1].  Singh engaged a Minnesota-based agent, Saul Mashaal,[1] to broker his investment.  Am. Compl. ¶ 8.

Patrick's alleges that this investment was "part of [Singh's] plan to emigrate to the United States through the Immigrant Investor Visa Program."  *Id.* ¶¶ 7, 9.  Under the Immigrant Investor Visa Program, "a foreign entrepreneur who makes a capital investment in the United States can receive a permanent [EB-5] U.S. visa. . . . [and] the entrepreneur and his dependent family members are eligible for conditional permanent residency in the United States."  *Vieira v. Korda*, Civ. No. 2:17-cv-160-jmc, 2018 WL 2122825, at *2 (D. Vt. May 8, 2018); *see also* 8 U.S.C. § 1153(b)(5).  This "EB-5 visa" is so named because it is the fifth-preference visa among the employment-based visas.  *See* U.S. Citizenship & Immigration Servs., *EB-5 Immigrant Investor Program*, https://www.uscis.gov/eb-5 (last visited July 2, 2019).  Patrick's alleges that Singh intended to immigrate to the United

---

[1]     Several pleadings and documents spell Mashaal's name as "Maashal" instead.  *See, e.g.*, Am. Compl. ¶ 8; Mem. in Opp'n at 2 [ECF No. 35].  But emails from Mashaal himself suggest "Mashaal" is the correct spelling.  *See* Second Bernet Decl. Ex. 2 [ECF No. 36-2].

States though he does not allege specifically whether Singh planned to reside in Minnesota. *See* Am. Compl. ¶ 9.

Patrick's counsel, at Singh's request, drafted an "Investment Opportunity offering" that contemplated a $3.5 million investment in improving four "Patrick's Group" restaurant divisions in exchange for a 40% ownership interest in the business. *Id.* ¶ 10; *id.* Ex. 1 at 1 ("The businesses now operating as Patrick's Group now [sic] has 4 different divisions, . . . which would be merged into a limited liability company . . . ."). Singh rejected this initial offering because it required a greater investment than would be necessary for Singh to be eligible for an EB-5 visa. Am. Compl. ¶ 11; *see* 8 U.S.C. § 1153(b)(5)(C) (requiring an investment of at least $1 million). Counsel for Patrick's then prepared a revised offering that contemplated a $1.3 million investment in consideration for a 40% ownership interest in one Patrick's location, "Patrick's Restaurant at Arbor Lakes." Am. Compl. ¶ 11; *id.* Ex. 2 at 1 [ECF No. 27-1]. This document further contemplated that Singh's investment would be used to expand Patrick's Restaurant at Arbor Lakes "into adjacent space for a private Event Center, with private dining space," as well as to remodel the existing restaurant and to add "10 or more additional staff." Am. Compl. Ex. 2 at 1; *see also* 8 U.S.C. § 1153(b)(5)(A)(ii) (requiring that the immigrant investor's investment will create full-time employment for ten or more people).

This revised offering also addressed that Patrick's "is currently structured as [a] Subchapter S corporation," but proposed that it "would be restructured" as an LLC after Singh's investment. Am. Compl. Ex. 2 at 1 ("Investment of $1,300,000 . . . will lead to the following steps . . . ."). Singh allegedly communicated to Patrick's that he "wanted the

type of investment vehicle that could make immediate distributions back to him, and with the lowest taxation rate, such as a limited liability company, rather than an S corporation." Second Bernet Decl. ¶ 11 [ECF No. 36]; *see also id.* ¶ 17 (stating that "reorganization, without Mr. Singh's investment, would make no sense [for Bernet] and would have adverse tax consequences for [Bernet]"). Throughout these negotiations and up to the date this case was commenced, Patrick's existed solely as a corporation; it had not yet formed an LLC.[2] *See* Kvinge Decl. Ex. B [ECF No. 23-1] (Certificate of Organization for Patrick's Restaurant, LLC, dated March 20, 2018), Ex. D [ECF No. 23-1] (Certificate of Incorporation for Patrick's Restaurant Inc. dated April 11, 2013).

According to Patrick's, there were "significant negotiations and discussions" between Singh, Mashaal, and Bernet between August and October 2017, including emails and telephone calls. Am. Compl. ¶ 13. At some point, Singh allegedly "accepted Plaintiff's proposed terms," and Patrick's counsel prepared two letters of intent, along with proposed distributions and projections, wire transfer instructions, a document checklist, and a draft "Articles of Conversion," all of which were sent to Singh. *Id.*; *id.* Ex. 3 [ECF

---

[2]    This action was brought by Patrick's Restaurant, LLC, a business entity that was formed on the same day the complaint was filed. *See* Compl. at 1 [ECF No. 1]; Kvinge Decl. Ex. B [ECF No. 23-1]. Many of the alleged contracts and related documents refer to Patrick's Restaurant, LLC, before this date, as though it already existed. Still others refer to Patrick's Restaurant, Inc., as though the two entities are one and the same. Patrick's has filed an affidavit in conjunction with this motion stating that "[t]o the extent necessary, Patrick's Restaurant, Inc. has ratified this action being prosecuted by Patrick's Restaurant, LLC, which is/was to be reorganized from Patrick's Restaurant, Inc." Second Bernet Decl. ¶ 1. Singh does not challenge the propriety of Patrick's Restaurant, LLC, bringing suit, and did not respond to opposing counsel's suggestion at oral argument that if anything, this was a real-party-in-interest issue under Rule 17.

No. 27-1].  At Singh's instruction, Mashaal traveled to Dubai to have Singh sign the letters of intent and complete an immigration attorney's questionnaire relating to the EB-5 visa process.  Am. Compl. ¶¶ 14, 27; *id.* Ex. 5 [ECF No. 27-1].

One letter of intent is entitled "Letter of Intent – Exclusive Right to Purchase."  First Bernet Decl. Ex. A at 2 [ECF No. 9-1] (hereinafter "First Letter of Intent"); *see also* Am. Compl. ¶ 15.  This First Letter of Intent is on Bernet's personal letterhead and opens by acknowledging that "it is [Bernet's] understanding that [Singh] intend[s] to make an investment totaling $1,300,000."  First Letter of Intent at 2.  The opening paragraphs of the letter recite the planned timeline for two payment "installments"—$300,000 on or before December 31, 2017, and $1 million on or before January 31, 2018.  *Id.*  The letter then provides:

> Please consider this letter an offer to grant you the exclusive right to purchase a 40% interest in Patrick's Restaurant, LLC. You will receive your 40% interest in Patrick's Restaurant, LLC when the entire purchase amount of US$1,300,000 [sic] is received.  The exclusive right to purchase granted herein shall remain open until January 31st 2018.
>
> First, a non-refundable payment of US $250,000 will be required on or before December 31, 2017 for me to grant you the exclusive right to invest directly into Patrick's Restaurant LLC.
>
> Second a non refundable [sic] payment of $50,000 shall be deposited into a suitable escrow accounts [sic] to be disbursed to pay [immigration legal fees and costs].

*Id.* at 2–3.  It closes with, "Thank you for considering this proposal," *id.* at 3, and attaches instructions for wiring the $300,000 (the total of the two "non-refundable" payments of $250,000 and $50,000) to Bernet's California bank, *id.* at 4.

The other letter of intent is entitled "Letter of Intent to Invest."  First Bernet Decl. Ex. B at 2 [ECF No. 9-2] (hereinafter "Second Letter of Intent"); *see also* Am. Compl. ¶ 16.  This letter from Bernet is on "Patrick's Restaurant, LLC" letterhead, and does not mention the $300,000 portion of the investment.  Second Letter of Intent at 2.  The letter states that "[a]fter Patrick's Restaurant, LLC receives [Singh's] investment of $1,000,000," Singh will have a 40% ownership share of the LLC.  *Id.*  It continues: "We all agree to act in good faith, to negotiate, approve, execute and deliver the agreements required to give full effect to the investment transaction before December 31st, 2017 so that the investment can be made on or before January 31st 2018."  *Id.*  The letter closes with, "This letter sets forth the general terms of your planned investment into Patrick's Restaurant, LLC."  *Id.* at 3.

On November 2, 2017, Singh signed both letters of intent in Dubai.  First Letter of Intent at 3 (showing Singh signed below the statement "I agree to the terms and conditions set forth above"); Second Letter of Intent at 3 (similar).  Singh then called Bernet to tell him that the initial wire transfer would be made by November 14, 2017.  Am. Compl. ¶¶ 15–17.  No wire transfer was made that day, but at that time Singh did sign another agreement with Patrick's: the Capital Contribution Agreement.  *See id.* ¶ 19.

The Capital Contribution Agreement essentially recites the same terms from the Second Letter of Intent, but it is styled more like a traditional contract.  *See* First Bernet Decl. Ex. C [ECF No. 9-3].  Like the Second Letter of Intent, it makes no mention of the $300,000 obligation—only the $1 million.  *See id.* at 1.  It specifies that "Patrick's Restaurant, LLC . . . will be re-organized as a Minnesota Limited Liability Company on or

6

about December, 31 2017 [sic] when the [required documents] will be filed with the Minnesota Secretary of State." *Id.* The contract contains two other noteworthy clauses. First, it provides that "if Mr. Singh does not make the required contribution on or Before Janaury [sic] 31, 2018, the unpaid amount . . . shall be deemed to be a debt of Mr[.] Singh which [Patrick's] may collect through legal action." *Id.* at 2. Second, it provides that the contract "shall in any and all events be governed by, construed and interpreted in accordance with the laws of the state of Minnesota." *Id.*

Around that same time, in November 2017, Singh signed an Operating Agreement for Patrick's Restaurant, LLC. Am. Compl. ¶ 26; *id.* Ex. 4 [ECF No. 27-1]. Although the LLC did not exist yet, the Operating Agreement (like the Capital Contribution Agreement) contemplated that Singh would have a 40% interest in the LLC and 40% voting power, while Bernet and Mashaal would have 51% and 9%, respectively. Am. Compl. Ex. 4 at 21.

Shortly after the execution of the two letters of intent, Capital Contribution Agreement, and Operating Agreement, things took a turn for the worse. Patrick's alleges that in mid- to late-November, Singh represented that the initial $300,000 payment had been wired to Bernet, but "Bernet could receive no confirmation it had." Am. Compl. ¶ 30. Singh represented that the money was forthcoming and would be issued by mid-December. *Id.* ¶ 31. But (again) the money didn't arrive. *See id.* ¶¶ 32–33. Singh repeatedly assured Bernet that he had wired the funds, going as far as to send "a purported wire transfer document from a bank in Russia." *Id.* ¶¶ 33, 35; *see* First Bernet Decl. Ex. E at 11 [ECF No. 9-5]. But (again) the money didn't come. *See* Am. Compl. ¶ 37. Emails from Mashaal

to Singh refer to "almost daily communications by text and phone calls" about the status of the wire transfer, though only select emails and text messages are attached to the complaint and affidavits. *Id.* Ex. 6 [ECF No. 27-1]; *see also* First Bernet Decl. ¶¶ 7, 10 [ECF No. 9] ("I received many e-mail messages from Mr. Mashaal and [Singh] . . . . [They] have sent many text messages to me . . . regarding the foregoing agreements and the alleged payments."); *id.* Ex. E (emails), Ex. G [ECF No. 9-7] (text messages).

Patrick's alleges that all along, Singh "knew Patrick's Restaurant, Inc. would be converted to [an LLC] . . . only when [Singh] paid the $1 million needed for the investment." Am. Compl. ¶ 26. Patrick's alleges that in late December, "Plaintiff put on hold Plaintiff's corporate reorganization until confirmation [of the $300,000 wire transfer] could be received." *Id.* ¶¶ 33, 42. But plans for the expansion of Patrick's Arbor Lakes restaurant were already underway in reliance on Singh's planned investment; these included negotiating a lease, expanding the restaurant, and reorganizing the corporation. *Id.* ¶¶ 29 ("working with brokers, architects, an asset manager, a landlord, and contractors"), 32, 34, 39 ("work[ing] with Defendant's immigration counsel"); First Bernet Decl. Ex. D [ECF No. 9-4] (proposal from landlord for expansion).

In early January, Singh "proposed an amendment to [the] transaction" that involved "delaying and reducing the payments." Second Bernet Decl. ¶ 16. Patrick's agreed and sent a new timeline for payment to Singh, which Singh further revised, but ultimately Singh did not sign the proposed amendment. Am. Compl. ¶ 38; *id.* Ex. 7 [ECF No. 27-1]. In mid-January, "[Singh] had Mr. Mashaal send Mr. Bernet a check for $300,000, on [Singh's] behalf." Am. Compl. ¶ 40; First Bernet Decl. Ex. F [ECF No. 9-6]. But Singh

"conditioned tender of the check on further delay and amendments [Patrick's] had not agreed to," so Patrick's never received the money.  Am. Compl. ¶ 40; *see also* First Bernet Decl. ¶ 9 ("[T]he check cannot be cashed, and [Patrick's] has received no payment from either [Singh] or Mr. Mashaal.").

Throughout February and into March 2018, Singh, Mashaal, and Bernet "continued to communicate."  Am. Compl. ¶ 44.  Ultimately, Singh never made the $300,000 payment or the $1 million payment.  *Id.* ¶ 45.  Patrick's felt the effects of Singh's alleged breach here in Minnesota.  Patrick's alleges it "lost the ability to expand and the profits anticipated from the expansion, the lease negotiations with the Landlord fell through, and [its] reputation and credibility have been damaged."  *Id.* ¶ 46.

Patrick's commenced this case on March 20, 2018.  *See* Compl. at 4 [ECF No. 1]. After Singh moved to dismiss for, among other things, a lack of personal jurisdiction, Patrick's filed an amended complaint that included additional jurisdictional allegations. *See* First Mot. [ECF No. 20]; Am. Compl.  Patrick's seeks to recover $1.25 million (presumably for the $1.3 million investment it alleges Singh contracted to make minus $50,000 for immigration-attorney fees and costs, which were for Singh's benefit), plus "all damages reasonably foreseeable, consequential, and incidental to Defendant's breaches." Am. Compl. ¶ 59.  Singh responded by renewing his motion to dismiss, arguing two

primary grounds for dismissal: (1) lack of personal jurisdiction under Rule 12(b)(2); and

(2) failure to state a claim under Rule 12(b)(6). *See* Second Mot. [ECF No. 30].[3]

Following oral argument on these motions, the Parties filed a joint letter saying that

they had "reached a tentative settlement" and that they "are currently working to complete

documentation and implement the settlement." ECF No. 42. The Parties represented that

the settlement had a June 30, 2019 effective date and asked for a stay of the case "pending

conclusion of the settlement." *Id.* The Parties represented they "would either file a

stipulation for dismissal at that time or promptly contact the Court." *Id.* In response to the

Parties' letter, an order was entered staying the case "until June 30, 2019, or until such

earlier date as the parties notify the Court that the case may be dismissed based on the

settlement or the stay lifted." ECF No. 43. June 30, 2019, has passed. The Parties have

not filed a stipulation for dismissal or otherwise contacted the Court.

II

A

The appropriate starting place is Singh's Rule 12(b)(2) motion. If personal

jurisdiction is lacking, it would be improper to consider the alternative ground for

dismissal; the absence of personal jurisdiction means the absence of judicial power to reach

---

[3]     Originally, Singh also sought dismissal under Rule 12(b)(5) for insufficient service of process. *See* Second Mot. At the time Singh filed his motion, no ruling had been made on Singh's objection [ECF No. 19] to Magistrate Judge Katherine Menendez's order [ECF No. 17] granting alternative service of process via email pursuant to Rule 4(f)(3). Shortly thereafter, Singh's objection was overruled, and Judge Menendez's order was affirmed. ECF No. 34 at 10. All agree this moots Singh's motion for dismissal under Rule 12(b)(5). *See* Mem. in Opp'n at 1 n.1; Reply Mem. at 2 n.1 [ECF No. 37].

the merits of a case.  *See Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1012 (D. Minn. 2008) (explaining that dismissal for lack of personal jurisdiction "is always without prejudice; such a dismissal implies nothing about the merits of the dismissed claims because the court is not empowered to address the merits of the dispute").  Personal jurisdiction "is an essential element of the jurisdiction of a district . . . court, without which the court is powerless to proceed to an adjudication."  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (alteration in original) (citation and internal quotation marks omitted).  "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists."  *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted).  "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant."  *Id.* (citations omitted).  "But where, as here, the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment."  *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citations omitted). At the summary-judgment stage, a case "should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper."  *Id.* (citations omitted).  Patrick's will not have to prove personal jurisdiction by a preponderance of the evidence "until trial or until the court holds an evidentiary hearing."  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003)

For the exercise of personal jurisdiction to be proper in a diversity case, it must comport with both the forum state's long-arm statute and due process. *Creative Calling*, 799 F.3d at 979; *see Birtcher Corp. v. Diapulse Corp. of Am.*, 87 S. Ct. 6, 7 (1966) ("[I]n diversity cases such as this[,] personal jurisdiction is to be determined by the federal courts in accordance with state law."). Because Minnesota's long-arm statute, Minn. Stat. § 543.19, "extends as far as the Constitution allows," this two-part issue boils down to one: whether the exercise of personal jurisdiction comports with due process. *Federated Mut. Ins. Co. v. FedNat Holding Co.*, __ F.3d __, 2019 WL 2619871, at *1 (8th Cir. 2019). Due process requires that a defendant have sufficient "minimum contacts" with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (citations and internal quotation marks omitted). This means "actions by the defendant" must "create a substantial connection with the forum [s]tate" and provide "fair warning" to the defendant that he may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citations and internal quotation marks omitted); *id.* at 474 (stating "defendant's conduct and connection with the forum" must permit him to "reasonably anticipate being haled into court there" (citation and internal quotation marks omitted)). The "fair warning" requirement will be met if the defendant has "purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 472–73 (citations and internal quotation marks omitted) (discussing the requirement of "purposeful availment").

12

The Eighth Circuit has identified five factors that district courts are to consider in their "touchstone inquiries ask[ing] whether personal jurisdiction over the nonresident defendant is based on 'minimum contacts' and whether assumption of personal jurisdiction would offend 'traditional notions of fair play and substantial justice.'" *Epps*, 327 F.3d at 648 (quoting *Int'l Shoe*, 326 U.S. at 316); *see also Pope*, 588 F. Supp. 2d at 1015 (calling these "separate, though related, requirements"). Those factors are: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). The first three factors are of primary importance, whereas the remaining two are secondary. *Id.* A court must consider these factors in the aggregate rather than individually. *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995); *see also Burger King*, 471 U.S. at 286 (rejecting "any talismanic jurisdictional formulas"). This is a fact-intensive inquiry. *See Kulko v. Superior Ct. of Calif.*, 436 U.S. 84, 92 (1978) ("[T]he 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed . . . . [T]his determination is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable." (citation and internal quotation marks omitted)); *Howells v. McKibben*, 281 N.W.2d 154, 157 (Minn. 1979) ("The determination of whether 'minimum contacts' are present in a given case must be made on a case-by-case basis; no hard and fast rule can be applied in resolving the question.").

B

Start with the third factor: the relation of the cause of action to the contacts. This factor distinguishes specific jurisdiction from general jurisdiction. *Johnson*, 614 F.3d at 794. Specific jurisdiction exists over causes of action arising out of or related to a defendant's contacts with the forum state, whereas general jurisdiction is broader and reaches any cause of action against a defendant whose forum contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum [s]tate." *Quality Bicycle Prod., Inc. v. BikeBaron, LLC*, No. 12-cv-2397 (RHK/TNL), 2013 WL 3465279, at *3 (D. Minn. July 10, 2013) (alterations in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Here, Singh is indisputably not "at home" in Minnesota, making this a question of specific personal jurisdiction. *Accord* Mem. in Supp. at 6–7 [ECF No. 32]; Mem. in Opp'n at 14–15 [ECF No. 35]; Reply Mem. at 9 [ECF No. 37] (stating that "Plaintiff confirms that the exercise of general jurisdiction is not appropriate").

Analysis of the first two factors—the nature and quality of contacts with the forum state and the quantity of those contacts—requires consideration of the parties' contractual relationship. "A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011). However, a contract is ordinarily "an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* (quoting *Burger King*, 471 U.S. at 479). "To determine whether a

14

defendant purposefully established minimum contacts with the forum, [the district court] must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Creative Calling*, 799 F.3d at 980 (quoting *Burger King*, 471 U.S. at 479).

Two of Singh's arguments merit early attention. First, Singh argues that the nature, quality, and quantity of his contacts are "extremely limited" and that "[a]part from [a] single alleged contract, Defendant is not alleged to have any other relationship or contacts with Minnesota." Mem. in Supp. at 6. Singh avers in his brief that "Defendant does not own property in Minnesota, conduct any other business in Minnesota, and has not visited Minnesota," nor is he "alleged to have actually sent any money to Minnesota," but Singh provides no accompanying affidavit attesting to his assertions of fact. *Id.* Without an affidavit or similar evidence, these assertions cannot be accepted. (This may not matter very much. It is, after all, Patrick's burden to establish personal jurisdiction, and Patrick's does not allege that Singh did any of these things. But more on that in a bit.)

Second, Singh asserts that this case involves an "unconsummated transaction"—not "unconsummated" in the sense of not being reduced to a finalized writing, but that neither party actually performed under the alleged contract(s). Reply Mem. at 9. Singh suggests that an unconsummated contractual transaction affords no basis for a finding of personal jurisdiction over a non-resident. *Id.* at 10. This position seems factually and legally doubtful. There seems to be no dispute that Singh did not remit $1.3 million to Patrick's and that Patrick's never gave Singh a 40% ownership share in the LLC. But to say the transaction is entirely "unconsummated" ignores the fact that Patrick's did undertake some

performance, or at least allegedly incurred reliance damages, by attempting to negotiate a new lease and an expansion of the restaurant. *See* First Letter of Intent at 3 (referencing the "Patrick's at Arbor Lakes expansion"); Am. Compl. ¶¶ 29, 32, 34, 39; First Bernet Decl. Ex. D. And Singh arguably attempted performance by sending a check with partial payment. First Bernet Decl. ¶ 9; *id.* Ex. F. Regardless, focusing on whether the contract is "unconsummated" misses the point that a party's negotiation and other activities leading up to a contract may establish contacts necessary for personal jurisdiction regardless of whether there is any performance under a contract. *Burger King* makes clear that what really matters for minimum contacts is the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." 471 U.S. at 479. Singh does not cite authority speaking to the significance of an "unconsummated transaction" in weighing minimum contacts. *See* Reply Mem. at 9–11. Several courts have found a prima facie showing of personal jurisdiction when faced with an executory contract or anticipatory breach. *See, e.g.*, *Gardner Eng'g Corp. v. Page Eng'g Co.*, 484 F.2d 27, 32 (8th Cir. 1973) (finding personal jurisdiction despite the fact that neither party had undertaken performance yet, where the repudiation occurred outside the forum but the performance was to occur within the forum); *Personalized Brokerage Servs., LLC v. Lucius*, No. Civ. 05-1663 (PAM/FLN), 2006 WL 208781, at *4 (D. Minn. Jan. 26, 2006) ("To the contrary, a failure to perform a legally required act within a forum can establish personal jurisdiction." (citations omitted)).

Under Minnesota law, "[a] crucial factor in determining whether a single sale suffices to justify personal jurisdiction is whether the nonresident in some way solicited

the sale or actively engaged in negotiating its terms.  In other words, where a nonresident defendant is an 'aggressor' in the transaction, it is more likely to have purposefully availed itself of the forum state's benefits and protections, so that personal jurisdiction is appropriate." *KSTP-FM, LLC v. Specialized Commc'ns, Inc.*, 602 N.W.2d 919, 924 (Minn. Ct. App. 1993) (citations omitted).  Here, Patrick's alleges that Singh pursued the contractual relationship from the start—in other words, that he was the "aggressor" who reached into the forum.  *See* Am. Compl. ¶¶ 7, 10.  Patrick's further alleges that throughout the transaction, both before and after the Capital Contribution Agreement was signed, Singh was an active negotiator—an "ongoing aggressor," so to speak.  *See id.* ¶¶ 11, 13, 25, 37.  "[T]he record is clear that . . . [Singh] aggressively pursued a business relationship" with Patrick's throughout the course of their dealing.  *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432 (8th Cir. 1995).  The record also shows that Singh continued to pursue the contract even after it had seemingly fractured, repeatedly reassuring Patrick's that he intended to perform.  *See* Am. Compl. ¶¶ 30–31, 33, 35–37, 40.

"When examining cases where little connection between the defendant and the forum state appears to exist, particularly where a *single act* connects plaintiff and defendant, the courts have looked especially to the defendant's role, purpose or expectation in the events in question." *Kreisler Mfg. Corp. v. Homstad Goldsmith, Inc.*, 322 N.W.2d 567, 571 (Minn. 1982).  Singh's alleged intent to immigrate to the United States through the Immigrant Investor Visa Program sets this case apart from others involving non-resident defendants who intended to do business only from abroad.  The Immigrant

Investor Visa Program is designed to allow entrepreneurs and their families to obtain a green card and become "permanent workers" in the United States.  U.S. Citizenship & Immigration Servs., *EB-5 Immigrant Investor Program*, https://www.uscis.gov/eb-5 (last visited July 2, 2019).  These EB-5 visas have been described as "appeal[ing] to those seeking more active, rather than purely passive involvement in a U.S. business."[4]  For those with the funds, an investment can be the fast track to citizenship.[5]  As a result, the program has been characterized (and criticized) as allowing foreign investors to "buy American citizenship."[6]  The Immigrant Investor Visa Program, then, is not a hands-off investment from afar; it is a path to citizenship.

---

[4]    Russell Flannery, *What's Ahead for the Fraud-Tainted U.S. EB-5 Visa Program?*, Forbes (Aug. 20, 2018, 11:22 PM), https://www.forbes.com/sites/russellflannery/2018/08/20/whats-ahead-for-the-fraud-tainted-u-s-eb-5-visa-program/#2e057f6d1618 (last visited July 2, 2019).

[5]    *See* Javier C. Hernandez, *Wealthy Chinese Scramble for Imperiled Commodity: U.S. 'Golden Visa'*, N.Y. Times (Apr. 27, 2017), https://www.nytimes.com/2017/04/27/world/asia/china-eb-5-golden-visa.html (last visited July 2, 2019) (noting that the EB-5 program is "sometimes referred to as a 'golden visa'"); Miriam Jordan, *Los Angeles Raids Target Investor Green Card Fraud*, N.Y. Times (Apr. 5, 2017), https://www.nytimes.com/2017/04/05/us/eb5-visa-investigation.html (last visited July 2, 2019) ("Participation can result in a green card in less than a year in some instances.  The cards can normally take a decade to obtain through sponsorship from an American employer or relative.").

[6]    Alana Semuels, *Should Congress Let Wealthy Foreigners Buy Green Cards?*, The Atlantic (Sept. 21, 2015), https://www.theatlantic.com/business/archive/2015/09/should-congress-let-wealthy-foreigners-buy-citizenship/406432/ (last visited July 2, 2019) (quoting an immigration lawyer and professor as saying that wealthy foreigners pursue EB-5 visas "because they want the green card and it's the fastest or best way to get a green card").

Here, Patrick's alleges that Singh "wanted to . . . move his family here" through the Immigrant Investor Visa Program, though it is unclear whether "here" means the United States in general or Minnesota in particular.  Mem. in Opp'n at 17; *see also* Am. Compl. ¶ 9 ("Defendant intended to . . . immigrate to the United States, including to enable Defendant's children to attend school in the United States.").  Accordingly, Singh's intent to immigrate is not necessarily the tie that binds him to the forum.  But Singh did not simply intend to make a one-time investment as the means to an end.  His investment was negotiated to give him a lasting tie to the forum: a 40% ownership and membership interest in an LLC, including not only future profit disbursements from a Minnesota business but voting rights in the LLC.  Thus, even if Singh never moved to Minnesota, he undoubtedly contemplated an ongoing relationship with the forum involving a significant and not passive investment.  The evidence reasonably may be interpreted to show that Singh "envisioned continuing and wide-reaching contacts" in Minnesota.  *FedNat*, 2019 WL 2619871, at *5 (citation and internal quotation marks omitted).

Patrick's does not allege that Singh has been physically present in Minnesota. Necessarily, then, Singh's contacts with Minnesota occurred through phone calls, emails, text messages, and purported fund transfers.  One exhibit to the complaint, an email from Mashaal, characterizes these communications as having occurred "almost daily."  Am. Compl. Ex. 6.  And Bernet, in his declaration, testifies that "Singh communicated often." Second Bernet Decl. ¶ 16.  Though a relatively small number of emails and text messages have been filed in connection with this motion, these documents do not discredit Mashaal and Bernet's assertions regarding the frequency of communications.  *See* First Bernet Decl.

Ex. E (emails), Ex. G (text messages); Second Bernet Decl. Ex. 1 [ECF No. 36-1] (text messages), Ex. 2 [ECF No. 36-2] (emails).  Singh has not identified evidence showing he did not direct communications to Minnesota.  He does not suggest that the communications he directed here were not as frequent as Mashaal and Bernet have described or not as substantive as one reasonably would expect given the significance of the contemplated contractual relationship.

Patrick's acknowledges that the majority of contacts between Singh and Bernet went through Mashaal, who Patrick's contends was Singh's agent, and Patrick's argues that Mashaal's contacts with Minnesota are relevant to determining whether there is personal jurisdiction over Singh.  *See* Mem. in Opp'n at 17–18.  Singh does not engage with this argument a great deal.  He seems only to assert that Mashaal served as his "broker."  Reply Mem. at 11.  Mashaal's precise status vis-à-vis Singh cannot be resolved one way or the other on this record.  Regardless, Minnesota law makes clear that a litigant's agent's contacts with a forum state may be considered to determine whether there is personal jurisdiction over the litigant, and here "the record is clear that [Singh] supported, accepted, and followed through on [Mashaal's] efforts."  *Wessels*, 65 F.3d at 1433 (finding purported agent's contacts with Minnesota were relevant to personal jurisdiction because "[u]nder Minnesota law, it is well established 'that a principal cannot accept the benefits of the agent's unauthorized conduct and then deny liability based on the fact that the conduct was unauthorized'" (quoting *Centennial Ins. Co. v. Zylberberg*, 422 N.W.2d 18, 21 (Minn. Ct. App. 1988))).

Finally, contractual terms in the Capital Contribution Agreement bear on personal jurisdiction. Most significantly, the Agreement contains a choice-of-law clause specifying that Minnesota law applies. *See* Capital Contribution Agreement at 2; *see also* Mem. in Opp'n at 19. Such provisions are "relevant to the jurisdictional question." *Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 923 (8th Cir. 1995) (citation omitted); *Wessels*, 65 F.3d at 1434 (calling choice-of-law provision "an important factor" in assessing purposeful availment); *see also Burger King*, 471 U.S. at 482 ("Nothing in our cases, however, suggests that a choice-of-law provision should be ignored . . . ."). "[W]hile relevant to the analysis, . . . [a] Minnesota choice-of-law provision alone does not establish personal jurisdiction." *FedNat*, 2019 WL 2619871, at *2 (finding choice-of-law clause "weigh[ed] in favor of personal jurisdiction"). *But see Dent-Air, Inc. v. Beech Mtn. Air Serv., Inc.*, 332 N.W.2d 904, 908 (Minn. 1983) (disagreeing that choice-of-law clause was an important factor because "[h]ad the parties wanted to ensure the use of Minnesota's courts in the event of breach of contract, they could have contractually consented to personal jurisdiction in Minnesota"). Additionally, although the agreement does not contain a forum-selection clause, it does contain a right-to-sue clause. *See* Capital Contribution Agreement at 2. The choice-of-law clause seems weightier because it is accompanied by a clause that puts Singh on notice that his breach could result in a lawsuit. These provisions are not dispositive, but they favor a finding of personal jurisdiction.

Standing alone, each of these contacts and considerations would be insufficient to confer personal jurisdiction. *See, e.g.*, *Creative Calling*, 799 F.3d at 980; *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015) ("[W]ire-transfers to and

from a forum state do not create sufficient contacts to comport with due process such that a foreign corporation could 'reasonably anticipate being haled into court there.'" (citation omitted)); *Viasystems*, 646 F.3d at 594 (affirming grant of motion to dismiss for lack of personal jurisdiction because "scattered e-mails, phone calls, and a wire-transfer of money . . . do not constitute a 'deliberate' and 'substantial connection' with the state such that [defendant] could 'reasonably anticipate being haled into court there'" (citation omitted)). But together, they are enough.  Singh sought to do business in Minnesota with Patrick's; Patrick's did not solicit Singh.  He executed contracts anticipating a relatively high-dollar investment in a Minnesota business that would culminate in a 40% ownership share of that Minnesota business.  He sent communications regularly and often to Minnesota citizens in an effort to finalize the contracts.  He retained a Minnesota-based broker to assist him with this process.  And Singh planned long-term ownership of a Minnesota business as evidenced not only by the nature of the contract documents, but also by his asserted pursuit of an EB-5 visa.

## C

Because "the purposeful-availment requirement is met and . . . the defendant has minimum contacts with the forum state, the court must, in the second step of the analysis, ask whether the exercise of personal jurisdiction over the defendant would nevertheless be so unreasonable as to violate the Due Process Clause."  *Pope*, 588 F. Supp. 2d at 1016; *see also Creative Calling*, 799 F.3d at 981–82 ("Even where a party has minimum contacts with a forum, jurisdiction can still be unreasonable.  The Due Process Clause forbids the exercise of personal jurisdiction 'under circumstances that would offend 'traditional

notions of fair play and substantial justice.'" (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987))).  This is where the fourth and fifth factors—Minnesota's interest in providing a forum for its residents and the convenience of the parties—come into play.  *Pope*, 588 F. Supp. 2d at 1018.

Minnesota no doubt has an interest in providing its citizens and businesses with a forum for dispute resolution, but that interest is proportional to the dispute's connection to the state.  *Cf. Westley v. Mann*, 896 F. Supp. 2d 775, 792 (D. Minn. 2012).  As for convenience, neither party has convincingly argued that this factor tilts in its favor.  Singh argues that this factor "does not support jurisdiction, given that Defendant is an individual who is located some 7500 miles away from this court and is a citizen of a foreign country." Mem. in Supp. at 7.  While "[t]he Court appreciates that it must be somewhat inconvenient" for a citizen of India to litigate in Minnesota, this inconvenience does not rise to the level of offending traditional notions of fair play and substantial justice.  *Pope*, 588 F. Supp. 2d at 1021; *see also Creative Calling*, 799 F.3d at 982 ("While defending a suit in [the forum] would be burdensome for [defendant], obtaining relief through litigation in [foreign country] would be burdensome for [plaintiff].").   And Singh has some level of "international reach," *Pope*, 588 F. Supp. 2d at 1021, as evidenced by the fact that he traveled from India to Dubai (in the United Arab Emirates) to execute the contract(s) at issue in this case.

To be sure, "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."  *Asahi Metal*, 480 U.S. at 115 (citation and internal quotation marks omitted).  But "in today's world of increasing

globalization and improved communication technology, the burden of international litigation is not as high as it was even [thirty] years ago, when *Asahi Metal* was decided." *Pope*, 588 F. Supp. 2d at 1022; *see also World-Wide Volkswagen*, 444 U.S. at 292–93 (recognizing that as the American economy has transformed, the Due Process Clause's limits on inconvenient litigation "have been substantially relaxed over the years"). Given that Singh has been able to "secure[] competent legal counsel" who has already "vigorously litigated this case," he "cannot make the requisite compelling case that exercising jurisdiction is unreasonable." *Pope*, 588 F. Supp. 2d at 1022. Singh's Rule 12(b)(2) motion to dismiss will be denied without prejudice to his ability to challenge personal jurisdiction at a later date. This is based on the allegations in the complaint and the very limited record created in connection with Defendant's 12(b)(2) motion.

III

A

Now for Singh's Rule 12(b)(6) motion. "When considering . . . a motion to dismiss under Fed. R. Civ. P. 12(b)(6)," the materials outside the pleadings must be ignored, but "materials that are necessarily embraced by the pleadings" may be considered. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citation and internal quotation marks omitted). The complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[7] "[A]ll factual allegations in the complaint" will be accepted as true, and "all reasonable inferences" will be drawn in

---

[7]     Plaintiff incorrectly cites the abrogated "no set of facts" standard in its brief. *See* Mem. in Opp'n at 20 (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)).

the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation and internal quotation marks omitted). But allegations in the complaint that are actually legal conclusions are not entitled to these same presumptions and inferences. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

At the outset, it is worth trying to pin down the nature of Patrick's contract claims and the contract(s) upon which they are based. Patrick's brings two breach-of-contract counts: (1) breach of contract and (2) anticipatory breach of contract. Am. Compl. ¶¶ 49–59. But these are not really two separate claims; the latter is just another theory by which Patrick's can prove a breach. *See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, No. 09-cv-3037 (SRN/LIB), 2015 WL 3915687, at *21 (D. Minn. June 25, 2015) ("Plaintiff's anticipatory repudiation claim is not distinct from its breach of contract claim. . . . Rather, 'breach,' the second element required to prove a breach of contract claim, may be evidenced by showing how the defendant anticipatorily repudiated its obligations under a contract."). Singh does not raise this issue, and there is no need to dismiss one or the other for their redundancy. Still, it is useful to recognize that there is really just one claim at issue, with two theories of breach. Depending the theory, Patrick's might seek to recover different classes of damages. *See id.*; *Tarpy v. Nowicki*, 175 N.W.2d 443, 447–48 (Minn. 1970). Also notable is the fact that the complaint does not allege exactly which contract(s) Singh breached—the First Letter of Intent, the Second Letter of Intent, the

Capital Contribution Agreement, some combination of the three, or something else entirely.[8]  *See* Am. Compl. ¶¶ 49–59.

"To plead a breach-of-contract claim under Minnesota law, the plaintiff must allege that (1) an agreement was formed, (2) the plaintiff performed any conditions precedent to the plaintiff's demand of performance by the defendant, and (3) the defendant breached the contract."  *Mono Advert., LLC v. Vera Bradley Designs, Inc.*, 285 F. Supp. 3d 1087, 1089–90 (D. Minn. 2018) (citing *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014)).  The breach-of-contract elements that Singh disputes are the existence of an agreement (he thinks the claim fails as a matter of law to the extent it seeks to recover under the letters of intent, which he says are not binding contracts) and the satisfaction of conditions precedent (he thinks the claim fails because reorganization into an LLC was, as a matter of law, a condition precedent).  *See* Mem. in Supp. at 10–13. These issues will be addressed in turn.

## B

"To prevail on a breach-of-contract claim, a plaintiff must show that a contract has been formed."  *Cargill Inc. v. Jorgenson Farms*, 719 N.W.2d 226, 232 (Minn. Ct. App. 2006).  Singh argues that "[t]o the extent Plaintiff's claim for breach of contract is based on the two Letters of Intent . . . it fails as a matter of law" because "a letter of intent is

---

[8]     At the hearing, Patrick's stated that it remains to be seen "what is the contract here," and argued that the contract is "a series of letters of intent, [the] Capital Contribution Agreement, member control agreement, all modified by emails, text messages, performance, or attempted performance. . . . This transaction kind of constitutes a little bit of everything."

merely an agreement to agree, and not a binding contract."  Mem. in Supp. at 10–11.

Essentially, he seeks dismissal of the breach-of-contract counts to the extent they seek to

recover under the alleged contracts that preceded the Capital Contribution Agreement

(which he does not dispute is a valid contract).  If the First Letter of Intent is not a contract,

the net effect is to preclude Patrick's from recovering the $300,000, which is only provided

for in the First Letter of Intent.  If the Second Letter of Intent is not a contract, there appears

to be no impact on damages, as it provides for the same $1 million contribution that is

required by the Capital Contribution Agreement.

As for the First Letter of Intent, Singh primarily frames the issue as whether the

letter was an agreement to agree or a binding contract (whereas Patrick's avoids the issue

altogether).  *See* Mem. in Supp. at 11.  The more appropriate question is whether it was an

option contract or a binding agreement.  *See id.* at 10, 12.  An option contract is "nothing

more than an irrevocable and continuous offer to sell for a specified period of time."

*Nafstad v. Merchant*, 228 N.W.2d 548, 550 (Minn. 1975) (citation omitted).  "Until an

option is effectively exercised, it is a mere unilateral undertaking, and if the time in which

it is to be exercised expires before its terms and conditions are met with, it lapses." *Ferch

v. Hiller*, 295 N.W 504, 506 (Minn. 1941) (citations omitted).  Here, the letter stated that

"[t]he exclusive right [*i.e.*, *the option*] to purchase granted herein *shall remain open* until

January 31st 2018."  First Letter of Intent at 2 (emphasis added).  It specified the manner

of accepting the option: "a non-refundable payment of US $250,000 will be required on or

before December 31, 2017 for me to grant you the exclusive right to invest."  *Id.*  These

terms, standing alone, make the First Letter of Intent look like a typical option contract.  If

so, the option contract did not obligate Singh to invest—it merely gave him the right to do

so.  "The fact that he did [not act in the manner specified] supports the conclusion of law

that plaintiff ha[s] no cause of action."  *Vogt v. Ganlisle Holding Co.*, 15 N.W.2d 91, 95

(Minn. 1994).

But the purported option contract does not stop there.  It also details other future

"terms and conditions" not particularly material to the option itself, such as the payment of

$1 million in exchange for 40% of Patrick's and the expansion of Patrick's at Arbor Lakes.

First Letter of Intent at 2–3.  There is a possibility, as Patrick's argued at the hearing, that

this option contract was instead "an integral part of the entire transaction" and a contract

in and of itself.  *M.L. Gordon Sash & Door Co. v. Mormann*, 271 N.W.2d 436, 440 (Minn.

1978); *see Fleisher Eng'g & Constr. Co. v. Winston Bros. Co.*, 42 N.W.2d 396, 398 (Minn.

1950) ("Where several instruments are made as part of one transaction, they will be read

together, and each will be construed with reference to the other.").  The question of

"[w]hether a contract exists is generally a question of fact."  *Cargill Inc.*, 719 N.W.2d at

232 (citation omitted); *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn.

1992) ("[T]he existence and terms of a contract are questions for the fact finder." (citation

omitted)).  There is precedent suggesting that "[a]t this early stage in the litigation, the

Court cannot determine" whether an agreement is a contract "as a matter of law."  *Jackson*

*v. Navitaire, Inc.*, Civ No. 04-1557 (RHK/AJB), 2005 WL 61490, at *3 (D. Minn. Jan. 11,

2005) (denying motion to dismiss breach-of-contract claim where "it [was] not apparent

from the face of the Complaint that there was 'mutual consent'"); *see also Fleisher Eng'g*,

42 N.W.2d at 399 ("The letter of intent and the negotiations and conduct of the parties, as

shown above, plainly indicate that the parties contemplated one contract, the purpose of which was to contain the whole bargain between the parties and express the result of all their contracts to date." (citation and internal quotation marks omitted)).  As applied to this case, it is unclear whether the First Letter of Intent is a binding standalone contract, or whether it is only binding insofar as it is part of the entire transaction.  The two letters of intent were signed on the same day, for example, and none of the three alleged contracts contains an integration or merger clause.  This looks like just the type of fact question that cannot be resolved at the motion-to-dismiss stage.

The Second Letter of Intent, which contains no language indicative of an option, is either a letter of intent or a binding contract.  "A letter of intent is generally not considered a contract; rather, it is considered an agreement to negotiate in the future."  *Facet Tech. Corp. v. Tele Atlas N. Am., Inc.*, Civ. No. 08-300 (DWF/FLN), 2008 WL 2439804, at *2 (D. Minn. June 12, 2008) (citing *Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925, 927 (Minn. Ct. App. 1992)); *see Richie Co., LLP v. Lyndon Ins. Grp., Inc.*, 316 F.3d 758, 760 (8th Cir. 2003) (applying Minnesota law).  Here, Singh is correct that in many respects the Second Letter of Intent reads like it "is merely an agreement to agree, and not a binding contract."  Mem. in Supp. at 11.  After all, the letter says that it "sets forth the general terms of [Singh's] planned investment" and that the Parties "all agree to act in good faith, to negotiate, approve, execute and deliver the agreements required to give full effect to the investment transaction."  Second Letter of Intent at 2–3.  And for what it's worth, the subject line of the letter calls it a "Letter of Intent to Invest."  *Id.* at 2; *see Metro Office*

*Parks v. Control Data Corp.*, 205 N.W.2d 121, 125 (Minn. 1973) ("The label 'letter of intent' is not alone determinative.").

But as with many rules of contract interpretation, there is an exception: "A letter of intent . . . can be binding if the parties manifest an intent to be bound by the instrument, and the instrument contains all the essential terms necessary for a binding agreement." *Facet Tech. Corp.*, 2008 WL 2439804, at *2 (citation and internal quotation marks omitted). Just like the First Letter of Intent, this Second Letter of Intent contains several provisions that go beyond simply summarizing "the general terms of [Singh's] planned investment." Second Letter of Intent at 3. And although it contemplates future agreements, the list of "required documents" to be "negotiate[d], approve[d], execute[d] and deliver[ed]" does not include a Capital Contribution Agreement. *Id.* at 2–3 (specifying that what remained to be drafted was a "Membership Unit Contribution Agreement," "Operating Agreement," and "Member Buy-Sell Agreement"). This suggests that the Second Letter of Intent could be something more than "a preliminary, non-binding proposal to agree." *FutureFuel Chem. Co. v. Lonza, Inc.*, 756 F.3d 641, 647 (8th Cir. 2014) (applying Arkansas law); *see Lindgren v. Clearwater Nat'l Corp.*, 517 N.W.2d 574, 574 (Minn. 1994) (letter of intent contained a specific provision that the parties "shall enter into a definite purchase agreement which shall be drafted by the buyers within 30 days"). As with the First Letter of Intent, the question of "[w]hether a contract exists is generally a question of fact." *Cargill Inc.*, 719 N.W.2d at 232. This, too, is an issue that cannot be resolved at this early juncture.

C

Finally, the Capital Contribution Agreement.  Singh argues that the Amended Complaint "fails to state a claim upon which relief can be granted, because Plaintiff has failed to allege that it performed all conditions precedent."  Mem. in Supp. at 12.  Singh contemplates that Patrick's reorganization from a corporation to an LLC was the condition precedent, and that this condition was "indisputably material."  *Id.* at 13.  Patrick's takes the position that corporate restructuring was "an immaterial part of the transaction that was not a condition [precedent] to defendant's payment obligations."  Mem. in Opp'n at 2.

Under Minnesota law, "[a] condition precedent is an event," including the other party's performance, "that must occur before a party is required to perform a certain contractual duty."  *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004) (citation omitted).  "If the event required by the condition does not occur, there [is] no breach of contract."  *Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018) (alteration in original) (citation and internal quotation marks omitted).  "[C]ontracts should be construed with a preference for finding mutual promises rather than conditions."  *Strategic Energy Concepts, LLC v. Otaka Energy, LLC*, No. 16-cv-463 (MJD/BRT), 2016 WL 7627040, at *5 (D. Minn. Nov. 18, 2016) (quoting *United States v. Gerth*, 991 F.2d 1428, 1434 (8th Cir. 1993)).  Rule 9(c) of the Federal Rules of Civil Procedure provides that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed."  It is only "when denying that a condition precedent has occurred or been performed" that a party must plead with particularity.  *Id.*  "A complaint that tracks the language of this Rule is

sufficient. Thus, the Court should not dismiss a complaint that generally avers that all condition precedents have been performed unless the complaint demonstrates on its face that a condition precedent did not occur." *ORIX Pub. Fin., LLC v. Lake Cty. Hous. & Redevel. Auth.*, No. 11-cv-3261 (MJD/LIB), 2012 WL 5382052, at *4 (D. Minn. Nov. 1, 2012) (cleaned up) (citation and internal quotation marks omitted).

Here, Patrick's avers in its operative complaint that "Plaintiff performed all material terms of its agreements with Defendant" and "complied with all its obligations under the agreements," but does not allege anything about "conditions precedent." Am. Compl. ¶¶ 53, 58. Plaintiff's complaint therefore does not plainly "track the language of the rule." In fact, the complaint makes clear that Patrick's thinks it was Singh's payments that were "necessary preconditions." *Id.* ¶ 43; *see id.* ¶ 58 (alleging Patrick's "was relieved of obligations based on Defendant's breaches and anticipatory breaches"). If the corporate reorganization was the condition precedent, then Patrick's needed to plead that it was satisfied under Rule 9(c)—and it did not, so the claim would fail as a matter of law. On the other hand, if Singh's investment was the condition precedent, then Patrick's has stated a claim for breach of contract because it "den[ied] that [the] condition precedent has . . . been performed . . . with particularity." Fed. R. Civ. P. 9(c). If neither act was a condition precedent, then Rule 9(c) is inapposite. And if the contract is ambiguous, it is a fact question whether there was a condition precedent. *C.H. Robinson Worldwide, Inc. v. U.S. Sand, LLC*, Civ. No. 13-1274 (JRT/FLN), 2014 WL 67957, at *3–4 (D. Minn. Jan. 8, 2014) ("Because it is not clear under the terms of the Agreements whether the implementation of an escrow account is a condition precedent to CHR receiving payment, the Court cannot

conclude that CHR's breach of contract pleadings fail." (citation and internal quotation marks omitted)); *see Olympus Ins. Co. v. AON Benfield, Inc.*, 711 F.3d 894, 898 (8th Cir. 2013) ("If the court determines that a contract is ambiguous, its interpretation then becomes a question of fact for the jury and the district court should not grant a motion to dismiss." (citation omitted)).

Singh appears to cabin his argument about the unsatisfied condition precedent to the Capital Contribution Agreement. *See* Mem. in Supp. at 12. To the extent that Singh urges the Court to resolve this question on the four corners of the Capital Contribution Agreement, it is safe to say that the contract does not unambiguously make reorganization a condition precedent to Singh's investment. The contract contemplates dates for performance that suggest reorganization might occur before the Singh's investment (December 31, 2017, versus January 31, 2018, respectively), but it specifically provides that reorganization will occur "on or about" December 31, 2017, whereas the investment date is a more firm deadline—"on or before" January 31, 2018. Capital Contribution Agreement at 1–2. Moreover, there is no provision indicating that time is of the essence, nor is there typical language signaling a condition precedent. *See James E. Brady & Co., Inc. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993) ("Although it is not always the case, conditions precedent are usually introduced by conditional language such as 'provided that' or 'on condition.'" (applying Missouri law)). Patrick's has argued that the Capital Contribution Agreement was just one part of a larger transaction, which included the letters of intent and was further modified by the Parties' course of dealing. Because the contours

of the alleged contracts are far from clear at this point, this issue presents another fact question that cannot be resolved at the motion-to-dismiss stage.[9]

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.    Defendant's Motion to Dismiss Amended Complaint [ECF No. 30] is **DENIED** as follows:

      a.    Defendant's Motion to Dismiss pursuant to Rule 12(b)(2) is **DENIED WITHOUT PREJUDICE**.

      b.    Defendant's Motion to Dismiss pursuant to Rule 12(b)(5) is **DENIED** as **MOOT**.

      c.    Defendant's Motion to Dismiss pursuant to Rule 12(b)(6) is **DENIED**.

---

[9]    Two business days before oral argument, Plaintiff filed a notice of supplemental authorities. ECF No. 38 (citing to five cases). Singh then filed an objection. ECF No. 39. In this objection, Singh informally requested that the Court "strike" the "unsolicited and unauthorized surreply," which he contends is prohibited by Local Rule 7.1(i). *Id.* at 1. In the alternative, Singh requested "permission to file a sur-surreply to address the new arguments and cases." *Id.* Singh's objection is understood as a motion to strike but will be denied. Singh is correct that this filing is not authorized by Local Rule 7.1(i). *See Rhodes v. Fabian*, No. 04-cv-176 (RHK/SRN), 2005 WL 2704896, at *2 n.1 (D. Minn. Sept. 12, 2005) (granting motion to strike supplemental authority in a habeas case because "the applicable rules do not permit the filing of the 'Supplemental Authority' document and . . . [the filing] does little more than rehearse arguments already made in [the party's] original memorandum"). As a practical matter, however, supplemental case citations can be helpful and—provided they are not used to assert new or additional arguments omitted from briefs—cause no prejudice. The alternative is to have litigants cite new cases for the first time on the record at a hearing.

2.      Defendant's Objection to Plaintiff's Notice of Supplemental Authorities

[ECF No. 39] seeking to strike Plaintiff's filing [ECF No. 38] from the record is **DENIED**.


Dated:  July 3, 2019                          s/ Eric C. Tostrud_____
                                              Eric C. Tostrud
                                              United States District Court